IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * *    C.R. No. 1:24-cr-00047-JJM
                                   *
UNITED STATES OF AMERICA       *
                                   *
      VS.                       *    JULY 25, 2024
                                   *
SEAN HITCHCOCK                  *
                                   *    VIA VIDEOCONFERENCE
* * * * * * * * * * * * * *    PROVIDENCE, RI


            BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

                        CHIEF JUDGE

                   Change of Plea Hearing


APPEARANCES:

FOR THE GOVERNMENT:     MILIND M. SHAH, AUSA
                        JULIANNE KLEIN, AUSA
                        Department of Justice - USAO
                        One Financial Plaza, 17th Floor
                        Providence, Rhode Island  02903

FOR THE DEFENDANT:      BRETT V. BEAUBIEN, ESQUIRE
                        The Law Office of Brett V. Beaubien
                        One Turks Head Place, Suite 1440
                        Providence, Rhode Island  02903

FOR THE DEFENDANT:      MARK J. O'BRIEN, ESQUIRE
                        O'Brien Hatfield, PA
                        511 West Bay Street, Suite 330
                        Tampa, Florida  33606


Court Reporter:         Denise A. Webb, RPR
                        One Exchange Terrace
                        Providence, RI  02903

VIA VIDEOCONFERENCE

25 JULY 2024 -- 10:00 A.M.

THE COURT:  We're here in the case of the United States versus Sean Hitchcock, Criminal Action 24-47.  Would counsel identify themselves for the record.

MR. SHAH:  Milind Shah for the United States, your Honor.

MR. O'BRIEN:  May it please the Court, good morning, my name is Mark O'Brien.  Present to my right, at least from my vantage point, is Sean Hitchcock.

MR. BEAUBIEN:  Good morning, your Honor.  Attorney Brett Beaubien, local counsel to Attorney Mark O'Brien for Sean Hitchcock.

THE COURT:  Great.  Ms. Klein.

MS. KLEIN:  Good morning, your Honor.  Julianne Klein with Milind Shah for the United States.

THE COURT:  Good morning, everyone.  Mr. Hitchcock, Mr. Jackson is going to swear you in.

(Defendant sworn)

THE CLERK:  Please state your name and spell your last name for the record.

THE DEFENDANT:  My name is Sean Hitchcock, H-I-T-C-H-C-O-C-K.

THE CLERK:  Thank you.

THE COURT:  Mr. Hitchcock, just before we begin the

change of plea, I want to make clear that you have a right to have this change of plea and any court proceedings conducted in person in open court with all parties present. I understand from your filing of the motion and with the Government's consent that you wish to proceed with the change of plea hearing remotely; is that correct?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Did your attorney fully explain to you your right under the Rules of Criminal Procedure to have this case heard in person?

THE DEFENDANT:  He did, your Honor.

THE COURT:  Okay.  And you're still desirous of proceeding remotely and waiving your right to appear in person?

THE DEFENDANT:  I do, your Honor.

THE COURT:  And we're proceeding here both with the Defendant's consent and with the consent of the Government; is that correct?

MR. SHAH:  That is correct, your Honor.

THE COURT:  So it's clear that there are no objections while there do not appear to be Federal Rule of Criminal Procedure provisions, we're proceeding remotely, the Court believes that that right contained in the Rules of Civil -- Criminal Procedure can be waived and find that Mr. Hitchcock's waiver in this case is knowing and

voluntary, and so the Court will proceed.

Mr. Hitchcock, you're under oath right now.  That requires you to give me truthful answers to the questions I ask.  If you fail to give truthful answers, the Government could bring further charges against you like fraud or giving a false statement or whatnot.  Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  I meant perjury, not fraud, by the way. If I ask you a question that you don't understand, Mr. Hitchcock, just ask me to explain it further, and I'd be glad to.  And if at any time you want to discuss any matter with your attorney, even before you answer a question, you let me know, and I'll give you that opportunity.  We can put you in a breakout room or mute you so you can privately talk with your attorney.  You just have to let me know that. Okay?

THE DEFENDANT:  Thank you, your Honor.

THE COURT:  Okay.  You signed a plea agreement in this case, Mr. Hitchcock.  Do you remember signing that plea agreement?

THE DEFENDANT:  I do, your Honor.

THE COURT:  And did you sign that plea agreement after you thoroughly reviewed it with your attorney?

THE DEFENDANT:  I did, your Honor.

THE COURT:  And did you sign that plea agreement

knowingly and voluntarily?

THE DEFENDANT:  I did, your Honor.

THE COURT:  Okay.  Mr. Hitchcock, how old are you?

THE DEFENDANT:  I am 33.

THE COURT:  And how far did you go in school?

THE DEFENDANT:  I graduated with a Bachelor's in 2014.

THE COURT:  Graduated from college with a Bachelor's?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Have you been treated recently for any mental illness or addiction to narcotic drugs?

THE DEFENDANT:  I -- no.  To answer your question, a few years ago I was prescribed anxiety meds.  I've taken them a few times over the last couple of years, but that is the extent of it, your Honor.

THE COURT:  You actually led into my next question, which is, as you sit here today, are you under the influence of any drugs, medication or alcoholic beverages of any kind?

THE DEFENDANT:  I am not, your Honor.

THE COURT:  Okay.  Have you received a copy of the information in this case; that is, the written charges that the Government has brought against you?

THE DEFENDANT:  We have it up here, your Honor.

THE COURT:  So you've received a copy of it.  Have

you had a chance to thoroughly review that with your attorneys?

THE DEFENDANT:  I have, your Honor.

THE COURT:  And are you fully satisfied with the representation that you've received from your attorneys in this case?

THE DEFENDANT:  Absolutely, your Honor.

THE COURT:  Mr. Hitchcock, before we get into the change of plea, I need to tell you about certain rights that you have under the constitution and laws of the United States.  I want to make sure that you understand that you have these rights and, more importantly, that if you change your plea to guilty, you're going to give up these rights.

So you can always and continue to plead not guilty in this case, and you can continue throughout all of the proceedings.  If you were to continue to plead not guilty, then you'd be entitled to a trial by a jury.  At the trial, you'd be presumed to be innocent, and the Government would have to prove each and every element of the charge it brings against you beyond a reasonable doubt.  You'd have a right to see, hear, confront, have your lawyer cross-examine all the witnesses and the evidence that the Government would put on in order to prove its case against you.

You'd also be allowed to put on a defense yourself.  In fact, you could subpoena people, require people to come to

court and testify in your defense.  You'd also be allowed to testify at that trial, but, more importantly, you could not be required to testify.  And if you chose not to testify, that fact could not be used against you in any way by the Court or the jury.

But, Mr. Hitchcock, if you change your plea to guilty today, you're going to give up all these rights and there will be no trial.  Do you understand that you have these rights, and if you change your plea to guilty you give up these rights?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Has anyone in any way attempted to force you to plead guilty or threatened you in any way to get you to plead guilty?

THE DEFENDANT:  No, your Honor.

THE COURT:  Has anyone made any promises or assurances to you other than what's contained in the plea agreement to get you to plead guilty to this charge?

THE DEFENDANT:  No, your Honor.

THE COURT:  So are you knowingly and voluntarily changing your plea to guilty this morning because you've now determined it's in your best interests to do so?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Now, Mr. Hitchcock, the maximum penalties that the Court could impose at the time of

sentencing are as follows:  The maximum term of imprisonment is 20 years, the maximum fine is $250,000, there's a three-year period of supervised release, and there will be a $100 mandatory special assessment.  Do you understand that these are the maximum penalties that the Court could impose at the time of sentencing?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Okay.  Now, Mr. Hitchcock, are you a citizen of the United States?

THE DEFENDANT:  I am, your Honor.

THE COURT:  Okay.  As a U.S. citizen, you have certain valuable civil rights that you could lose if you plead guilty to this felony.  You could lose the right to vote, the right to hold public office, the right to serve on a jury and the right to possess any kind of firearm or ammunition.  Do you understand that you could lose these valuable civil rights if you plead guilty to this felony?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Okay.  Mr. Shah, are there any forfeiture allegations?

MR. SHAH:  There are not, your Honor.

THE COURT:  Okay.  Thank you.  Now, Mr. Hitchcock, I want you to understand how the Court will go about determining what an appropriate sentence is in your case if you plead guilty.  At some point after this hearing, a

Probation Department will contact your attorney in order to set up an interview with you.  They'll likely conduct that by telephone or Zoom or some remote way.  You have a right to have your lawyer present with you for that or on the phone with you or whatnot.  And I encourage you to make sure that your lawyer is present with you for that interview, because it's an important interview.

The Probation Department will take the information it gathers in the interview, conduct a further investigation, and then prepare a presentence report based on all of that. That presentence report is going to give me a lot of information about you and your background, criminal history and whatnot.  Also, it's going to contain the advisory sentencing guidelines.  Those are guidelines that help the Court determine what an appropriate sentence is in your case.

Now, your attorney might have calculated what he thinks the guideline range would be or the Government may have told your attorney what it thinks the guideline range would be. None of that is binding on me.  I won't determine your guideline range until after the presentence report is issued, both sides have a chance to object to it, and at the time of sentencing, usually in about 75 days, that's when I'll determine the guideline range.

Do you understand as we sit here today that the Court

has not yet determined what the guideline range is in your case?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  And you know that the Court could impose a sentence that's above or below the guideline range, and, in fact, could go as high as the maximum sentence I told you about.  You understand that, as well?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And as part of your plea agreement, you agreed to waive any right to appeal the sentence that I impose if the sentence is within or below the guideline range.  Do you understand that you've waived your right to appeal the sentence I impose under those circumstances?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Okay.  I'm going to ask Mr. Shah now on behalf of the U.S. Government to tell us what the elements of the charge are contained in the information, and then to tell us what facts the Government would prove if this case were to go to trial.  And, Mr. Hitchcock, I want you to pay particular attention to the facts, because at the end of it, I'm going to ask you if you admit the facts that the Government has stated are true.  Okay?  Is that good?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  Mr. Shah.

MR. SHAH:  Thank you, your Honor.  The information

counts -- the information charges one count of conspiracy to commit wire fraud. The elements for that are, number one, that an agreement, specifically the agreement specified in the information, existed between at least two people and that agreement was to commit wire fraud. Second, that Mr. Hitchcock willfully joined in that agreement.

The agreement specified in the information is an agreement to commit wire fraud by knowingly devising and executing and attempting to execute a scheme and artifice to defraud individual computer users and to obtain money, funds, assets and property by means of false and fraudulent pretenses, representations and promises through the use of interstate and international wire transmissions.

Your Honor, were this matter to proceed to trial, the Government's evidence would establish the following: First, that tech support fraud was a multitiered form of telemarketing fraud in which, first, publishers posted online advertisements that misled victims to believe that viruses had been detected on the victims' computers and then urged the victims to telephone a specified number for assistance.

Second, victim telephone calls generated by these misleading ads were sold and routed directly to call centers or intermediary call brokers through whom the calls were ultimately sold and routed to call centers.

And, third, call center operators received the victims' calls and offered the victims computer technical support in exchange for payment.

Your Honor, just by way of clarification for all of the parties, the names of noncharged parties have been anonymized in what I am about to read. The actual names do appear in the plea agreement in paragraph four. The plea agreement remains under seal.

THE COURT: Thanks, Mr. Shah.

MR. SHAH: Your Honor, continuing on, Company 1 was a provider of call routing and tracking services that enabled the sale and routing of calls from victims of tech support fraud to call brokers and to call centers, including calls from tech support fraud victims generated by publishers engaged in tech support fraud.

These are the facts and acts that the Government's evidence would establish. By August 2017 and continuing to approximately October 2021, Defendant, who was a salesperson for Company Number 1, knew that numerous clients of Company Number 1 were engaged in tech support fraud, had been so advised by Company 1's principals, who were Principal Number 1 and Principal Number 2, and had, at the direction of those principals, assisted those clients in the use of Company 1's call routing services to further tech support fraud activities, all for the purpose of increasing Company

Number 1's revenue and Defendant's sales commissions.

Between August 2017 and October 2021, Defendant had on his own and at the direction of Principal Number 1 and/or Principal Number 2, and together with those principals, Defendant had on numerous occasions reviewed pop-ups, landing pages and websites associated with clients of Company Number 1 who were engaged in tech support fraud and recognized that those pages were perpetuating fraud by falsely indicating to viewers that a virus or malware had been detected on the viewers' computers.

Between August 2017 and October 2021, Defendant, again, at the direction of Principal Number 1 and Principal Number 2, solicited numerous individuals and companies -- those are individuals and companies that the Defendant and the two principals knew to be engaged in tech support fraud -- solicited numerous individuals and companies to be customers of Company Number 1 and to use Company Number 1's call routing services for the execution of tech support fraud.  And many of those solicitations resulted in those individuals and companies becoming clients of Company Number 1 and using Company Number 1's call routing services for the execution of tech support fraud.

Between August 2017 and October 2021, Defendant, at the direction of Principals Number 1 and 2, instructed clients of Company Number 1, who Defendant and the two principals

knew to be engaged in tech support fraud, to utilize PHP script rather than JavaScript on pop-ups, landing pages and websites, because use of PHP Script would prevent the information on those pop-ups, landing pages and websites from readily being tied to Company Number 1 and its call routing services.

Between August 2017 and October 2021, Defendant, at the direction of Principal Number 1 and Principal Number 2, directed clients of Company Number 1, who Defendant and the two principals knew to be engaged in tech support fraud, to rotate telephone numbers frequently and to use large pools of telephone numbers, because doing so would minimize instances where complaints by victims of tech support fraud would be associated with Company Number 1 or its clients.

Between August 2017 and October 2021, in response to being advised by telephone carriers of complaints accusing Company Number 1's clients of engaging in tech support fraud, Principal Number 1 told carriers that the particular telephone numbers associated with those complaints had been deallocated and suggested that the clients who had used those numbers were no longer using Company Number 1's services, when, in fact, Principal Number 1 would direct Defendant to instruct clients to use other telephone numbers to continue their use of Company Number 1's services.

Between October 2017 and October 2021, Principal

Number 1 told Defendant that Principal Number 1 had arranged for Company Number 1's clients, who Principal Number 1 and Defendant knew were engaged in tech support fraud, to shift from telephone number carriers that did not tolerate tech support fraud to a telephone carrier that was willing to tolerate tech support fraud.

Between August 2017 and October 2021, Principal Number 1 and Principal Number 2 directed Defendant to terminate clients whose telephone numbers were generating numerous complaints from telephone number carriers and who were not generating significant revenue for Company Number 1, while also directing Defendant to maintain clients who were engaged in tech support fraud whose telephone numbers were only occasionally or rarely generating complaints from carriers, and who were generating significant revenue for Company Number 1.

Between August 2017 and October 2021, Company Number 1's revenue from calls routed in furtherance of tech support fraud were between 9.5 million and $25 million, and this revenue is less than the total fraud loss associated with those calls, as the total fraud loss includes the additional revenue associated with those calls that was obtained by the publishers, brokers and call centers.

Those are the facts the Government's evidence would establish were this matter to proceed to trial, your Honor.

THE COURT:  Thanks, Mr. Shah.  Mr. Hitchcock, you heard the elements of the charge that the Government has brought against you.  I again remind you, they have to prove each and every one of those elements beyond a reasonable doubt for you to be found guilty of that charge.

You also heard the facts that the Government says it would prove beyond a reasonable doubt if this matter were to go to trial.  Do you admit the facts that the Government has stated are true?

THE DEFENDANT:  Your Honor, may I speak to my attorney quickly?

THE COURT:  Of course you can.  Just so the record is clear, they've been muted and are off screen so that they can talk privately.

(Off the record)

THE COURT:  I think we are all back together.  Mr. Hitchcock, can you hear me?

THE DEFENDANT:  I can.

THE COURT:  I'll ask you again, do you admit the facts that the Government has stated are true?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Okay.  Before I ask you about your change of plea, Mr. Hitchcock, do you have any questions for me or do you want to discuss any further matters with your attorney?

THE DEFENDANT:  Not at this time, your Honor.

THE COURT:  How do you now plead to the one-count information brought against you; guilty or not guilty?

THE DEFENDANT:  Guilty, your Honor.

THE COURT:  This Court has heard from the Government the evidence it would present if this matter were to go to trial, the Court has questioned Mr. Hitchcock regarding his understanding of the nature of the proceedings and the consequences of entering a plea of guilty to the charge.  It is, therefore, the finding of this Court in the case of the United States versus Sean Hitchcock that Mr. Hitchcock is fully capable and competent to enter an informed plea, that he's aware of the nature of the proceedings and the consequences of his plea, and that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the charge, and, therefore, the plea is accepted, and Mr. Hitchcock is now deemed guilty of those offenses -- that offense.

Mr. Shah, before I give the sentencing date, is this likely to need to be continued, the sentencing or --

MR. SHAH:  Yes, your Honor.  Sentencing will likely need to be continued, and defense counsel and I will put in a motion for that.

THE COURT:  I'm just wondering if we -- Ryan, I'm

just wondering, rather than make that happen if we shouldn't just put it out further.

THE CLERK:  Judge, it would make sense to keep it on as we had planned, just for tracking purposes.

THE COURT:  Okay.  That's fine, then.  So sentencing will be set down for October 29th at 10 a.m. Thanks, Ryan.

Mr. Shah, anything further for the Government?

MR. SHAH:  Nothing further at this time.  Thank you, your Honor.

THE COURT:  You're welcome.  Mr. O'Brien, anything further for Mr. Hitchcock?

MR. O'BRIEN:  No, sir.  And thank you for allowing us to appear via video as we are both in Florida.  We appreciate that.

THE COURT:  I don't understand why there's not an explicit statement in the Rules of Procedure that would allow it with all parties' consent.  It doesn't exist.  Most of my colleagues and I are of the opinion that even though an exception isn't explicitly stated that the parties can waive it.  This is the first time I've been asked to do it. I'm more than happy to do it again, assuming everyone agrees, so thank you.

Mr. Hitchcock, you know that the conditions that were placed on you by I think Judge Almond at the time of your

arraignment remain in full force and effect until the time of sentencing.  Do you understand that?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Okay.  Great.  We'll stand adjourned. Take care, everybody.

(Proceedings Adjourned)

C E R T I F I C A T I O N


I, Denise A. Webb, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


Dated this 24th day of February, 2025




/s/ Denise A. Webb_____

Denise A. Webb, RPR
Federal Official Court Reporter